Mark L. Javitch (CA SBN 323729)
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 300-0343
mark@javitchlawoffice.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

| | |
|---|---|
| LISA KILKER,<br><br>  Plaintiff,<br><br>v.<br><br>JOHN EWING, JR., in his official capacity as MAYOR OF THE CITY OF OMAHA,<br><br>  Defendant. | Case No.: 8:25-cv-00614-JFB-JMD<br><br>**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Fed. R. Civ. P. 56; NECivR 7.1<br><br>Jury Trial Demanded |

# TABLE OF CONTENTS

Introduction ........................................................................................................................1

Legal Standard ..................................................................................................................2

Argument ...........................................................................................................................3

    I.  Plaintiff Is Entitled to Summary Judgment on Count I: ...........................................3

        A.  The Mayor's Facebook Page Is a Designated Public Forum ......................3

        B.  Mayor Ewing's Actions Constitute State Action Under *Lindke v. Freed* ....5

        C.  The Mayor Engaged in Viewpoint Discrimination ......................................6

    II.  Plaintiff Is Entitled to Summary Judgment on Count II ...........................................8

        A.  Count II Applies an Objective Viewpoint-Discrimination Standard: The Mt. Healthy Framework Does Not Apply ...............................................................9

        B.  The Government May Close a Designated Public Forum Only on a Viewpoint-Neutral Basis, and a Viewpoint-Infected Closure Is Subject to Strict Scrutiny 9

        C.  The Post Deletion Was Viewpoint-Infected and Therefore Unconstitutional ...................................................................................................................11

        D.  The "Consistency" Rationale Is Directly Contradicted by the Undisputed Record and Cannot Satisfy Strict Scrutiny .......................................................13

    III.  Defendant's Monell Affirmative Defense Does Not Bar Relief ...........................15

Conclusion ......................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................ 2

*Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021) ........................................................ 4, 5

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) .................... 3, 9

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) ...................................................... 3, 5, 8

*Kentucky v. Graham*, 473 U.S. 159 (1985) .................................................................... 15

*Lindke v. Freed*, 601 U.S. 187 (2024) ........................................................................... 5, 6

*Matal v. Tam*, 582 U.S. 218 (2017) ............................................................................. 7, 12

*Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ....................................... 15

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) .......................... 9

*Packingham v. North Carolina*, 582 U.S. 98 (2017) ..................................................... 3, 5

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ................................................. 15-16

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ......................... 9

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................................... 6, 10, 13-14

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............... 6-7, 9-11

*Snyder v. Phelps*, 562 U.S. 443 (2011) ............................................................................ 7

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) .............................. 13-14

**Constitutional Provisions**

U.S. Const. amend. I .............................................................................................. passim

**Statutes**

42 U.S.C. § 1983 ..................................................................................................... passim

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................... 2

## INTRODUCTION

This case involves two First Amendment violations, one of which is not disputed. Defendant John Ewing, Jr., the Mayor of the City of Omaha, has **admitted** in his Answer to the First Amended Complaint that Plaintiff Lisa Kilker suffered a First Amendment violation when he deleted her comment and blocked her from his official Facebook page based on her viewpoint. The City of Omaha's own pleading states: "[T]his Answer . . . mark[s] the City of Omaha's admission that Kilker suffered a First Amendment loss on or about October 10, 2025." Doc. 30 at 1. Defendant has further admitted that once the October 4, 2025 post was open for public commenting, the First Amendment prohibited it from blocking users based on viewpoint, from deleting Plaintiff's comment, and from deleting the post in its entirety. *Id.* at 2.

The remaining dispute is whether the Mayor committed a **second**, separate, and independent First Amendment violation when he deleted the entire October 4, 2025 post three days after deleting Plaintiff's comment and blocking her — permanently closing the designated public forum he had created and destroying all 18 public comments and 218 reactions within it. Plaintiff contends that the post deletion is a distinct constitutional wrong under Count II: a viewpoint-tainted closure of a designated public forum that independently violates the First Amendment regardless of and in addition to the admitted Count I violation. The undisputed record establishes both violations as a matter of law.

Every key operative fact has been established through Defendant's own admissions. The Mayor (1) personally controlled his official Facebook page; (2) opened the October 4, 2025 post to public comment, creating a designated public forum; (3) deleted Plaintiff's

viewpoint-critical comment because he viewed it as "harassment"; (4) blocked Plaintiff from the page; (5) deleted the entire post, permanently erasing the public forum; and (6) with full knowledge of this litigation, allowed Facebook's thirty-day restoration window to expire, permanently converting a remediable harm into an irreversible one. On Count I, Defendant has conceded liability. On Count II, the undisputed causal sequence, Defendant's own admission that the post deletion was constitutionally prohibited, and his deliberate choice to let the forum's destruction become permanent compel judgment as a matter of law. The only remaining disputes — the appropriate scope of relief and the quantum of compensatory damages — are for the Court and the jury respectively. Plaintiff respectfully moves for summary judgment on liability on both counts. The evidentiary record is set forth in the separately filed Index of Evidence and Statement of Undisputed Material Facts.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Evidence that is "merely colorable" or "not significantly probative" cannot create a triable issue. *Id.* at 249–50. Where, as here, the defendant has expressly admitted the key operative facts, there is no dispute for the factfinder to resolve.

ARGUMENT

I. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I

   *A. The Mayor's Facebook Page Is a Designated Public Forum.*

The First Amendment's protection against government suppression of speech turns first on the nature of the forum in which the speech occurs. The Supreme Court has identified three categories: (1) traditional public forums, such as streets and parks, which have long been open by custom and tradition to public discourse; (2) designated (or limited) public forums, which are spaces the government has intentionally opened for expressive activity; and (3) nonpublic forums, which have not been opened for general public expression. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). Government regulation of speech in traditional and designated public forums is subject to strict scrutiny. *Id.*

A "designated public forum" is created when the government "intentionally designated a place or means of communication as a public forum." *Cornelius*, 473 U.S. at 802. Once such a forum is created, "speakers cannot be excluded without a compelling governmental interest." *Id.* The hallmark of a designated public forum is an intentional governmental opening of a channel for public expression: the government must have made an affirmative choice to open the space for discourse, not merely permitted some speech incidentally. *Id.*

The Supreme Court has recognized that social media now occupies the position once held by streets and parks as the preeminent space for public discourse and citizen-to-government communication. *Packingham v. North Carolina*, 582 U.S. 98, 104–05 (2017). When a government official opens a social media page to public commenting, the comment section functions as a designated public forum. *Davison v. Randall*, 912 F.3d 666, 682 (4th

3

Cir. 2019). In *Davison*, the Fourth Circuit applied *Cornelius*'s standard and found that a county supervisor's Facebook page constituted a designated public forum because she had "intentionally open[ed the public comment section] for public discourse." *Id.* The court identified the key indicia: whether the page was used as a "tool of governance"; bore the official's title and government contact information; was promoted through official channels; solicited constituent input; and was used for official announcements. *Id.* at 680–81.

All of those factors are present here. Mayor Ewing's Facebook page: (1) was designated a "Government Official" page in Facebook's own classification system, listing the City's phone number, address, and website, and the Mayor's Deputy Communications Chief's email address (Stip. ¶ 3; SMF ¶ 6); (2) was linked to and promoted through official City communications (SMF ¶ 7); (3) was used to issue official municipal announcements—fire department leadership, condolences, parade routes, and parking notices (Stip. ¶ 4; SMF ¶ 8); (4) was created specifically as the Mayor's "official account for public dissemination of information" (SMF ¶ 4); and (5) was open to public commenting, with the Mayor himself replying to commenters before Plaintiff posted (Stip. ¶¶ 6–8; SMF ¶¶ 9–11).

This case is materially distinct from *Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021), where the Eighth Circuit found no state action because the representative had created her account while a private citizen, used it predominantly for campaign purposes, and had never converted it into a "tool of governance." *Id.* at 827. The *Campbell* court specifically distinguished accounts—like Ewing's—that are "converted into a tool of governance" by use for official municipal business. *Id.* Here, Mayor Ewing's official page was created by him and his staff as a government account from its inception (SMF ¶ 4), designated by Facebook as a "Government Official" page (Stip. ¶ 3; SMF ¶ 5), promoted through official City channels

(SMF ¶ 6), and used for official municipal announcements (Stip. ¶ 4; SMF ¶ 7). Defendant admits all of these facts. Doc. 30 ¶ 2 (admitting FAC ¶¶ 6–7, 9, 11, 12–16, 20, 22).

Mayor Ewing's Facebook page is precisely the type of official elected-representative account the Supreme Court described in *Packingham*: a designated channel through which a government official invites constituent engagement on public affairs, bearing every indicia of official status that *Davison* identified as converting a social media page into a tool of governance and a designated public forum.

### B. Mayor Ewing's Actions Constitute State Action Under Lindke v. Freed.

The Supreme Court's unanimous decision in *Lindke v. Freed*, 601 U.S. 187 (2024), established the controlling test for when a public official's social-media conduct constitutes state action: "a public official's social-media activity constitutes state action under §1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Id.* at 198.

Both prongs are decisively satisfied on the admitted facts. As to the first prong—actual authority—the Mayor of a city is vested with broad authority to speak on behalf of the municipality regarding governance, public safety, infrastructure, and municipal affairs. Mayor Ewing exercised precisely this authority when he used the page to announce City business and respond to constituents on municipal issues. Stip. ¶¶ 2, 4; SMF ¶¶ 3    , 7; Doc. 30 ¶ 2 (admitting FAC ¶¶ 12–16). As to the second prong—purporting to exercise that authority—*Lindke* held that an official "purports to exercise state authority" when a post expressly invokes state authority, has an immediate government-related effect, or consists of information not otherwise available through private channels. *Id.* at 203.

The Supreme Court in *Lindke* offered a hypothetical directly on point: "Take a mayor who makes the following announcement exclusively on his Facebook page: 'Pursuant to Municipal Ordinance 22.1, I am temporarily suspending enforcement of alternate-side parking rules.' The post's express invocation of state authority, its immediate legal effect, and the fact that the order is not available elsewhere make clear that the mayor is purporting to discharge an official duty." *Id.* Mayor Ewing's page is not merely analogous to this hypothetical—his page was the official channel for City communications that were not posted elsewhere, and was used to make government announcements of the same type. Stip. ¶¶ 3–4; SMF ¶¶ 4, 6–7.

The *Lindke* Court further held that a page labeled "Government Official"—as Ewing's was—signals official status in a way that an ambiguous or personal-seeming page does not. *Id.* at 202 (explaining that a page's label is entitled to a "heavy . . . presumption" as to whether posts are personal or official). Mayor Ewing's page bore an explicit "Government Official" classification. This resolves any ambiguity about the official character of the page and the state action requirement. Further, Defendant admits the state action element. Doc. 30 ¶ 2 (admitting FAC ¶¶ 42, 48, 58, 60).

### C. The Mayor Engaged in Viewpoint Discrimination.

The government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Viewpoint discrimination is the most serious violation of this principle. The Supreme Court has held that "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the

speaker is the rationale for the restriction." *Id.* Viewpoint discrimination is, in consequence, "an egregious form of content discrimination" that is "presumptively unconstitutional." *Id.* at 829–30. The operative test follows directly from *Rosenberger*: the question is "whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 582 U.S. 218, 243 (2017) (Kennedy, J., concurring in part). Both elements are satisfied and admitted here.

The "relevant subject category" is constituent speech about the Mayor's performance on municipal infrastructure—specifically, the sinkhole collapse at the Regis building and his promise to assist affected residents. Within that subject, Mayor Ewing eliminated the critical voice (Plaintiff's) and preserved the favorable ones (the 17 other commenters, all of whom were supportive). Stip. ¶¶ 9, 12; SMF ¶¶ 14, 17, 19. This is the textbook definition of viewpoint discrimination under *Matal*: the Mayor singled out Plaintiff's message—and only her message—for disfavor based on the view it expressed.

The admitted facts make the viewpoint basis explicit. Mayor Ewing characterized Plaintiff's comment as "harassment"—a label he applied to no other commenter. Stip. ¶ 11. But Plaintiff's comment was not harassment; it was a constituent demanding accountability from her elected official on a matter of pressing public concern: a $1 million municipal infrastructure failure and the Mayor's unfulfilled promises to address it. Speech of this kind lies at the apex of First Amendment protection. "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values' and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Speech "deal[s] with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Id.* at 453 (citation omitted). Plaintiff's comment—criticizing the Mayor's

7

inaction on a municipal infrastructure failure that cost residents $1 million—self-evidently satisfies that standard. "The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Id.* (internal citation omitted).

When Mayor Ewing labeled this protected speech "harassment" and suppressed it while leaving favorable speech in place, he engaged in viewpoint discrimination as a matter of law. Indeed, in the analogous social-media context, the Fourth Circuit has held that targeting comments critical of the politician "renders the banning all the more problematic as such speech occupies the core of the protection afforded by the First Amendment." *Davison,* 912 F.3d at 687.

Defendant does not contest this. The City of Omaha's Answer admits that its decision to delete Plaintiff's post and block her "was motivated by disagreement with her viewpoint." Doc. 30 ¶ 2 (admitting FAC ¶ 48). It further admits that the blocking and deletion constituted "impermissible viewpoint discrimination in violation of the First Amendment." Doc. 30 ¶ 2 (admitting FAC ¶ 49). Summary judgment on Count I is warranted.

## II.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II:

Count II arises from the deletion of the entire October 4, 2025 post. Plaintiff submits that this deletion constitutes a second, independent First Amendment violation — a viewpoint-tainted closure of a designated public forum — that is separately cognizable under the First Amendment and separately actionable under 42 U.S.C. § 1983. At minimum, even if the Court views the post deletion as part of a single continuous course of viewpoint discrimination rather than a discrete second violation, the deletion constitutes additional unconstitutional conduct that bears directly on the scope of equitable relief and the quantum of compensatory damages. Either framing warrants summary judgment on the undisputed record.

### A. Count II Applies an Objective Viewpoint-Discrimination Standard: The Mt. Healthy Burden-Shifting Framework Does Not Apply.

Count II does not sound in retaliation. It is a straightforward application of the viewpoint discrimination doctrine that governs Count I, and the two theories carry materially different elements. A First Amendment retaliation claim under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), requires threshold proof of subjective retaliatory motive and triggers burden-shifting on whether the defendant would have taken the same action regardless. Viewpoint discrimination doctrine asks an entirely different, objective question: did the government restrict speech — or close a forum — *because of* the viewpoint expressed? *Rosenberger*, 515 U.S. at 829. That inquiry is answered by examining the government's own stated and admitted rationale, not by probing subjective intent or resolving a hypothetical counterfactual. Where, as here, the Mayor has *admitted* that he characterized Plaintiff's comment as "harassment" based on its critical viewpoint, and where the forum in which that viewpoint appeared was subsequently deleted in its entirety, viewpoint infection of the closure is established as a matter of law without resort to *Mt. Healthy*'s burden-shifting framework.

### B. The Government May Close a Designated Public Forum Only on a Viewpoint-Neutral Basis, and a Viewpoint-Infected Closure Is Subject to Strict Scrutiny.

The government may close or restrict access to a designated public forum, but only if it does so on a viewpoint-neutral basis. When the government has "intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest." *Cornelius*, 473 U.S. at 800. Once the government designates a forum, it is "bound by the same standards as apply in a traditional public forum" and may not use the closure power to restrict access based on the views of speakers. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). A restriction that is

9

viewpoint-based is subject to strict scrutiny and is presumptively unconstitutional regardless of the form the restriction takes. *Rosenberger*, 515 U.S. at 828–30.

The strict scrutiny standard applies with equal force when viewpoint discrimination is the mechanism of a forum closure, not merely a restriction within an open forum. The Supreme Court has consistently held that "[v]iewpoint discrimination is thus an egregious form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30. Content-based restrictions on speech in a designated public forum — and viewpoint-based restrictions are the most severe form of content discrimination — trigger strict scrutiny: the government must demonstrate both a compelling interest and that the restriction is narrowly tailored to serve that interest. *Reed*, 576 U.S. at 163. This standard applies whether the government restricts speech within a forum or closes the forum itself: a government cannot escape strict scrutiny for viewpoint discrimination by choosing closure over restriction. The closure is itself the act of discrimination, and its constitutionality is evaluated under the same exacting standard. *See Rosenberger*, 515 U.S. at 828 ("[V]iewpoint discrimination is forbidden" even "when the limited public forum is one of [the government's] own creation").

The reason is structural. If a government could immunize viewpoint discrimination from strict scrutiny simply by closing the forum rather than restricting speech within it, the entire public forum doctrine would be a dead letter. Any official who wished to suppress a disfavored viewpoint could do so by deleting the forum — erasing not just the targeted speech but all speech — and claim immunity on the ground that no forum remained. The First Amendment forecloses that maneuver. A forum closure that is the product of viewpoint discrimination is itself a viewpoint-based act subject to strict scrutiny. *Cornelius*, 473 U.S. at 802.

The First Amendment prohibits the government from using its forum-closure authority as a mechanism to accomplish what it cannot do directly—namely, suppress a disfavored viewpoint. Critically, Defendant has already admitted this principle. In his Answer to the First Amended Complaint, Defendant expressly acknowledged that once the October 4, 2025 post was open for public commenting, the First Amendment prohibited the City from "deleting the post in its entirety." Doc. 30 at 2. That admission resolves Count II. Defendant cannot simultaneously admit that deleting the post was constitutionally prohibited and contend that the deletion is lawful.

### C. The Post Deletion Was Viewpoint-Infected and Therefore Unconstitutional.

The admitted facts establish that the deletion of the October 4, 2025 post was the direct product of Mayor Ewing's viewpoint-based objection to Plaintiff's comment—not a neutral policy decision. The causal chain is unambiguous and entirely drawn from Defendant's own sworn responses.

First, Mayor Ewing read Plaintiff's comment and labeled it "harassment." Stip. ¶ 11. That characterization is itself a viewpoint judgment—a value judgment about the content of her speech that reflects his disagreement with her perspective, not any objective policy standard. The Court has held that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. The Mayor's own label—"harassment"—establishes that Plaintiff's viewpoint was precisely the "rationale for the restriction."

Second, no other commenter—all of whom posted supportive remarks—received the same treatment. Stip. ¶ 12; SMF ¶ 23. Under *Rosenberger* and *Matal*, the question is "whether—within the relevant subject category—the government has singled out a subset of

11

messages for disfavor based on the views expressed." 515 U.S. at 829; 582 U.S. at 243 (Kennedy, J., concurring in part). The answer is yes: within the subject category of constituent speech about municipal governance, Mayor Ewing singled out the critical voice and suppressed it while leaving favorable voices undisturbed.

Third, the post deletion followed directly from the same viewpoint-based episode that produced the comment deletion and the blocking. Stip. ¶¶ 9, 11; SMF ¶¶ 17–18, 21–22. On October 13, 2025, after the Mayor had already deleted Plaintiff's comment and blocked her from the page—he instructed his staff to delete the entire post. The deletion did not merely prevent future speech; it erased the public record of the speech that had already occurred, including all 18 comments and 218 reactions from members of the public who had nothing to do with this dispute. Stip. ¶ 15. A government actor cannot launder viewpoint-based suppression into a permissible forum closure simply by deleting the container rather than the targeted speech alone.

Fourth, and critically, Defendant had the opportunity to remedy the harm and chose not to. Facebook retains deleted posts for thirty days, during which the post owner may restore them. Stip. ¶ 16; Def.'s Resp. to Interrog. No. 8; SMF ¶ 31. Until on or about November 12, 2025, the post remained restorable, and Defendant was on notice of this action and of Plaintiff's constitutional claim throughout that window. He chose not to restore the post. The decision to let the restoration window close is not exculpatory; it is aggravating evidence that Defendant intended the suppression to be permanent.

### D. The "Consistency" Rationale Cannot Satisfy Strict Scrutiny.

Defendant's stated justification – "consistency" – is directly contradicted by Mayor Ewing's own admitted conduct. The October 4, 2025 post was live and open for nine days. During that time, 18 members of the public posted comments and 218 submitted reactions. Mayor Ewing personally replied to five separate commenters before Plaintiff posted. Stip. ¶ 8; SMF ¶ 13. No instruction to disable comments was issued. No other post was deleted. The "intended policy of not allowing comments" was not implemented on any other post, and was not implemented on this post until after the Mayor had already deleted Plaintiff's comment and blocked her from the page. A policy that was neither communicated nor enforced during which the policymaker himself personally engaged with five constituents in the comment section is a post-hoc justification.

Even if the Court were to credit the consistency rationale as genuine, it cannot satisfy strict scrutiny. Because the forum closure was viewpoint-infected, the government bears the burden of proving both: (1) that the closure served a compelling governmental interest; and (2) that it was narrowly tailored — i.e., that it was the least restrictive means of serving that interest. *Reed*, 576 U.S. at 163; *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Defendant cannot carry that burden.

**Prong 1 — No Compelling Governmental Interest.** The interest Defendant has identified is administrative uniformity — maintaining a consistent no-comments policy across his official page. Administrative convenience and reputational management are not compelling governmental interests. A desire to prevent criticism is not a legitimate government interest at all, let alone a compelling one: Nor does the government have a compelling interest in erasing speech that has already occurred. The public had already spoken in the October 4, 2025 comment section; the comments and reactions were a historical record of civic engagement.

13

Permanent destruction of that record serves no interest that the Constitution would recognize as compelling.

**Prong 2 — Not Narrowly Tailored.** Even if administrative consistency were a compelling interest, the total destruction of the public forum is not the least restrictive means of achieving it. The government had numerous less restrictive alternatives available: (a) disabling the comment function prospectively on future posts, without deleting this post; (b) pinning a statement to the page announcing the no-comments policy going forward, without erasing the existing record; (c) hiding individual comments that violated any articulated policy standard, without destroying all 18 comments and 218 reactions by other members of the public who had engaged in good faith; or (d) archiving the post in a non-interactive format. Mayor Ewing himself acknowledged that his action was disproportionate — he admitted under oath that deleting Plaintiff's comment was something he "should not have" done. Stip. ¶ 16; Doc. 12-1 at 2, ¶ 6. A government official's own concession that the restriction was unnecessary is powerful evidence that it fails narrow tailoring. *Playboy*, 529 U.S. at 822 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."). Defendant cannot carry that burden here.

Crucially, the requirement of strict scrutiny cannot be avoided by invoking a neutral-sounding justification: "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165. The "consistency" rationale is precisely this type of neutral-sounding cover. The post-deletion "policy" cannot be credited as viewpoint-neutral when the undisputed sequence shows it was applied for the first and only time immediately after — and in direct response to — a viewpoint-critical comment.

14

There is no genuine dispute of material fact on Count II. Plaintiff is entitled to judgment as a matter of law.

### III.  DEFENDANT'S MONELL AFFIRMATIVE DEFENSE DOES NOT BAR SUMMARY JUDGMENT

Defendant has asserted as an affirmative defense that Plaintiff fails to state a claim under *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658 (1978). This defense fails.

First, Mayor Ewing is sued *in his official capacity only*. FAC ¶ 5. The Supreme Court has held that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The "real party in interest is the entity"—here, the City of Omaha—not the Mayor personally. *Id.* Because an official-capacity suit is treated as a suit against the municipality, Plaintiff must still satisfy *Monell*'s "policy or custom" requirement. As explained below, that requirement is satisfied here: the challenged acts were decisions by the Mayor acting as the City's final policymaker, which independently establishes municipal policy under *Pembaur*.

Second, the Mayor's acts themselves constitute municipal policy. The Supreme Court held in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," because "even a single decision by [a] properly constituted [government body] unquestionably constitutes an act of official government policy." *Id.* at 480. The Court elaborated: "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or repeatedly." *Id.* at 481. The Mayor of Omaha is the City's final policymaker with respect to his own official communications and the management of his official social media presence. His decisions to delete Plaintiff's

15

comment, block Plaintiff, and delete the post in its entirety were single decisions by a final policymaker that constitute official municipal policy under *Pembaur*.

## CONCLUSION

For the foregoing reasons, Plaintiff Lisa Kilker respectfully requests that the Court grant her Motion for Summary Judgment on both counts of the First Amended Complaint.

Respectfully submitted,

Dated: March 13, 2026

By: /s Mark L. Javitch
Mark L. Javitch CA SBN 323729
Attorney for Plaintiff Lisa Kilker
**JAVITCH LAW OFFICE**
3 East 3rd Ave., Suite 200
San Mateo, California 94401
Telephone: (650) 781-8000
Facsimile: (650) 300-0343
Email: mark@javitchlawoffice.com

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d)(3), the undersigned certifies that this brief complies with the word limit of NECivR 7.1(d)(1) because it contains fewer than 13,000 words, excluding the caption, table of contents, table of authorities, signature block, and this certificate. This brief was prepared using word-processing software. The undersigned further certifies that no generative artificial intelligence was used to draft any substantive argument in this brief, and that any AI-assisted research or drafting was reviewed, verified, and adopted by counsel.

By: /s Mark L. Javitch<br>
Mark L. Javitch